IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re
Shante D. Crawford                                    Case No. 08-28338-svk
            Debtor.                                   Chapter 13

**MEMORANDUM DECISION ON OBJECTION TO CONFIRMATION**

This case involves the now well-known "hanging paragraph" of 11 U.S.C. § 1325(a) and its application to the "negative equity" included in the financing of a vehicle which would otherwise qualify for the protection of the hanging paragraph. One of the most hotly contested issues created by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, this question has sharply divided the courts with many well-reasoned, persuasive decisions on both sides. Dozens of Bankruptcy Courts,[1] a few District Courts and one Bankruptcy Appellate Panel have spoken.[2] The Eleventh Circuit was the first Court of Appeals to decide the issue;[3] cases are presently pending in the Fourth and Ninth Circuit Courts of Appeals;[4] and the Second Circuit recently certified the question to the New York Court of Appeals.[5] The Seventh Circuit has not yet considered the issue, but two of my colleagues have confronted it and written thorough and insightful opinions.[6] After reviewing all of these detailed and scholarly decisions,[7] this Court cannot hope to offer anything new, but will attempt to reach a result that fairly applies the statute in accordance with Congressional intent.

If the legal analysis is somewhat mind boggling, at least the facts are simple. When Shante Crawford (the "Debtor") purchased a 2006 Honda Accord, she traded in her 2005 Nissan Altima and received a "trade allowance" of $15,000. However, the outstanding loan balance on the Nissan was $18,378.56. Therefore, Honda Finance advanced $3,378.56 (the negative equity)

---

[1] See *In re Brodowski*, 391 B.R. 393, 396 n. 1 (Bankr. S.D. Texas 2008) (noting that the court reviewed 38 decisions from various jurisdictions, and this was only a portion of the published opinions on the issue).
[2] *See, e.g., General Motors Acceptance Corp. v. Peaslee (In re Peaslee)*, 373 B.R. 252 (W.D.N.Y. 2007); *Americredit Fin. Servs., Inc. v. Penrod (In re Penrod)*, 392 B.R. 835 (B.A.P. 9th Cir. 2008).
[3] *Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295 (11th Cir. 2008).
[4] *Wells Fargo Fin. Acceptance v. Price*, 2007 U.S. Dist. LEXIS 97420 (E.D.N.C. Nov. 14, 2007), *appeal docketed*, No. 07-2185 (4th Cir. Dec. 12, 2007); *Americredit Fin. Servs., Inc. v. Penrod*, No. 08-60037 (9th Cir. Aug. 15, 2008).
[5] *Reiber v. GMAC, LLC (In re Peaslee)*, 2008 U.S. App. LEXIS 21788 (2d Cir. Oct. 20, 2008).
[6] *In re Dunlap*, 383 B.R. 113 (Bankr. E.D. Wis. 2008); *In re Smith*, 2008 Bankr. LEXIS 2525 (Bankr. E.D. Wis. June 25, 2008).
[7] In his otherwise well-reasoned opinion, *In re Look*, Judge Haines quoted Tim Buckley's Starsailor album. 383 B.R. 210, 216 n. 11 (Bankr. D. Me. 2008), *aff'd*, *Bank of Am. v. Look*, 2008 U.S. Dist. LEXIS 54695 (D. Me. July 17, 2008). In search of inspiration and curious about this artist and the song, I found a short clip and listened. I do not recommend this to others. The corresponding online review called the album "his most extreme artistic statement, a cacophonous fusion of progressive jazz and avant-garde idioms with few comfortable moments. Buckley stretches the limits of his phenomenal vocal range to its limits, shrieking and moaning like a soul truly possessed." I was immediately required to listen to the entire "Bridge over Troubled Water" album to recover.

along with the cash price of the Honda.[8] The Debtor granted Honda Finance a security interest in the Accord to secure this debt. When she filed Chapter 13 bankruptcy within 910 days of purchasing the Honda Accord, the Debtor's plan proposed to strip down Honda Finance's secured claim to the value of the Honda. In response to Honda Finance's objection to confirmation, the Debtor alleged that the hanging paragraph, which prevents such lien stripping, did not apply because of the financing of the negative equity.

The hanging paragraph provides that Bankruptcy Code § 506 shall not apply to a claim "if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred in the 910-day (sic) preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor." The issue in this case, as in all negative equity cases, is whether the creditor has a purchase money security interest securing the debt that is the subject of its claim.

The Bankruptcy Code contains a comprehensive definitions section, but "purchase money security interest" is not included. *See* 11 U.S.C. § 101. While there has been some support for a federal standard that would apply to this narrow issue,[9] the Seventh Circuit Court of Appeals has made clear that State law should apply in this context. *See In re Wright*, 492 F.3d 829 (7th Cir. 2007). The applicable State law that defines purchase money security interests is the Uniform Commercial Code (UCC), which underwent massive revisions that were effective in 2001. Article 9 of the UCC deals with security interests, and § 9-103 of Revised Article 9, enacted in Wisconsin as Wis. Stat. § 409.103, specifically governs purchase money security interests. Revised § 9-103 was derived from former § 9-107. The former Section clearly divided purchase money security interests into two categories: a seller's purchase money security interest and a lender's purchase money security interest. Former § 9-107 provided:

> A security interest is a "purchase money security interest" to the extent that it is
>
> (a) taken or retained by the seller of the collateral to secure all or part of its price; or
> (b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

Revised § 9-103(a)(1) combines these definitions in one paragraph:

> "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

---

[8] Honda Finance also financed the service contract obligation of $1,187, sales tax of $656.66, and title fees of $68.50. Although some courts have ruled that service contract fees, gap insurance and the like are not part of the purchase money security interest, the Debtor in this case has only challenged the portion attributable to negative equity. *See GMAC v. Horne,* 390 B.R. 191, 197 (E.D. Va. 2008) (collecting cases on gap insurance, extended warranties and service contracts).

[9] *See In re Westfall,* 376 B.R. 210, 213 (Bankr. N.D. Ohio 2007).

Under this definition, a lender's purchase-money obligation consists of (1) the value given to the debtor; (2) that enabled the debtor to acquire rights in the collateral; (3) that the debtor in fact used to acquire the collateral. The requirement that the value be "in fact used" to acquire the collateral means that a purchase money security interest cannot secure antecedent debt. The reason behind the rule is that a creditor with a purchase-money security interest receives priority over other secured creditors. As Judge Easterbrook explained:

> Purchase-money security interests usually take priority over earlier security agreements with after-acquired-property clauses. A purchase-money advance brings in a new asset, and because the security interest cannot exceed the value of the asset existing creditors are no worse off.

*Salem Nat'l Bank v. Smith*, 890 F.2d 22 (7th Cir. 1989). However, if antecedent debt or loans given to enable the debtor to conduct business are given purchase-money status, "virtually all secured loans would be secured by purchase money security interests," neither an intended nor desirable consequence. *In re Woodworks Contemporary Furniture, Inc.*, 44 B.R. 971, 973 (Bankr. W.D. Wis. 1984) *quoting Nw. Nat'l Bank v. Lectro Sys., Inc.,* 262 N.W.2d 678, 680 (Minn. 1977). As a priority provision, the requirements of a purchase-money security interest should be strictly construed. *See generally In re Flight Transp. Corp. Sec. Litig.*, 874 F.2d 576, 581 (8th Cir. 1989) (statutes that may diminish distributions to other creditors are strictly construed); *Matthews v. Transamerica Fin. Servs. (In re Matthews)*, 724 F.2d 798, 801 (9th Cir. 1984) ("Purchase money security is an exceptional category in the statutory scheme that affords priority to its holder over other creditors, but only if the security is given for the precise purpose as defined in the statute. And we should not lose sight of the fact that the lender chooses the form."); *First Nat'l Bank v. United States*, 13 Cl. Ct. 385 (Cl. Ct. 1987) (collecting cases strictly construing former UCC § 9-107).

By its nature, antecedent debt that existed prior to the purchase of the collateral is not a right in the collateral. And negative equity, as a debt owed on a previous purchase, is clearly antecedent debt. *In re Munzberg*, 388 B.R. 529, 539 (Bankr. D. Vt. 2008); *In re Johnson*, 380 B.R. 236, 243 (Bankr. D. Or. 2007) (the liability for negative equity is not an expense "incurred in connection with acquiring" a vehicle; it is an antecedent debt). This Court finds Judge Brown's explanation in *Munzberg* especially compelling:

> Comment 2 to UCC § 9-107 (the precursor to UCC § 9-103) explicitly provided that a purchase money security interest could not secure a pre-existing claim or antecedent debt. *See In re Billings*, 838 F.2d 405, 407 (10th Cir. 1988); *Dominion Bank of Cumberlands, NA v. Nuckolls*, 780 F.2d 408, 413 (4th Cir. 1985); *In re Matthews*, 724 F.2d 798, 800-01 (9th Cir. 1984); *In re Penny*, 15 B.R. 124, 127 (Bankr. E.D. Va. 1981). The current Official Comment 5 to 9A V.S.A. § 9-103 states that § 9-103(b), which describes when a security interest in goods and software is a PMSI, is limited to goods and software, but "[o]therwise, no change in meaning from former section 9-107 is intended." As a consequence, it appears that the definition of PMSI under former UCC § 9-107 has essentially

3

not changed, and that Comment 2 to former § 9-107 is currently applicable, although that Comment was not retained in the Official Comments to the Revised Article 9. *See Lavigne*, 2007 Bankr. LEXIS 4187, 2007 WL 3469454 at * 6 (citing cases under former § 9-107 Comment 2 as still applicable to show that antecedent debt could not be PMSI).

*Munzberg*, 388 B.R. at 539-40. Section 9-103 of Revised Article 9 as enacted in Wisconsin, including the Official Comments, is identical to that enacted in Vermont. Accordingly, the analysis would be the same: a purchase money security interest cannot secure an antecedent debt; negative equity is an antecedent debt; therefore a purchase money security interest cannot include negative equity. *See also Americredit Fin. Servs., Inc. v. Penrod (In re Penrod),* 392 B.R. 835, 849 (B.A.P. 9th Cir. 2008) (negative equity is antecedent debt).

This Court respectfully disagrees with the Eleventh Circuit's determination that negative equity is not antecedent debt. *Graupner v. Nuvell Credit Corp. (In re Graupner),* 537 F.3d 1295, 1301 (11th Cir. 2008). Antecedent debt is typified in *Coomer v. Barclays Am. Fin., Inc. (In re Coomer)*, 8 B.R. 351 (Bankr. E.D. Tenn. 1980).[10] In *Coomer*, the debtor took out a loan from Merit Finance to purchase furniture. Merit loaned the debtor (1) money to purchase the furniture and (2) money to pay off a prior loan the debtor had with Merit. As collateral for the entire loan, Merit took a security interest in the furniture. While struggling with how to allocate the non-purchase money portion and the purchase money portion of the remaining debt, the *Coomer* court had no trouble finding that the prior loan was antecedent debt, and not part of the purchase money security interest. *See also Matthews v. Transamerica Fin. Servs. (In re Matthews)*, 724 F.2d 798, 801 (9th Cir. 1984) (refinance constitutes value to enable debtor to pay off loan, not acquire rights in collateral). The negative equity here is no different than the prior loan in *Coomer*.

*Graupner* and many other courts, including Judge Pepper in *Smith*, read State automobile sales finance laws and consumer protection acts as *in pari materia* with the UCC to support the conclusion that negative equity is part of the price, not an antecedent debt. This Court's first concern with this approach is that these laws do not define "purchase money security interest," which is the language at issue in this case. Honda Finance points out in its brief that under the Wisconsin Consumer Act, the definition of "amount financed" includes "the amount paid or to be paid by the creditor pursuant to an agreement with the customer to discharge a security interest in or lien on property traded in." Wis. Stat. § 421.301(5). But this definition does not mean that the negative equity is part of a creditor's purchase money security interest under the UCC definition. By including negative equity in the definition of "amount financed," the provision simply acknowledges that a consumer creditor can finance the negative equity as part of the transaction, and that this component must be disclosed to the consumer.

---

[10] *Coomer* is a case cited by the *Freeman* case noted in *Graupner*. *See Snap-On Tools, Inc. v. Freeman (In re Freeman)*, 956 F.2d 252, 255 (11th Cir. 1992).

The Wisconsin Consumer Act and the UCC should not be read *in pari materia* because of their vastly different purposes. When a creditor attempted to graft UCC definitions onto the Wisconsin Consumer Act, the District Court rightfully rejected the argument:

> The UCC has no applicability in interpreting the WCA's definition of consumer act because the statutes have different language and because the UCC covers commercial transactions involving highly sophisticated commercial actors -- as compared to the average consumer. Especially when faced with a broad statute like § 421.301(9), the court should not artificially limit it by comparing it to statutes with different language and different purposes.

*Burney v. Thorn Ams.*, 944 F. Supp. 762, 768 (E.D. Wis. 1996). The divergent purposes of the purchase money security interest provisions of the UCC (to provide priority for those creditors financing the debtor's purchase of assets) and the Wisconsin Consumer Act (regulation of finance charges and disclosure of all charges incurred by the consumer in the financing transaction) militate against reading these statutes together to make negative equity -- an antecedent debt – a component of a purchase money security interest. Faced with a similar argument, and an identical statutory introduction, the Bankruptcy Court in *In re Acaya*, 369 B.R. 564, 570 (Bankr. N.D. Cal. 2007) stated:

> The legislative history of the [Automobile Sales Finance Act] makes plain that the ASFA is a consumer protection statute that imposes disclosure requirements on dealers and is not helpful in determining what constitutes a purchase money security interest under the California UCC. Importantly, the prefatory statement to ASFA § 2981(e) qualifies the application of the definition of "cash price" by providing "unless the context otherwise requires," a qualification that invites consideration of the context.

The Wisconsin Consumer Act similarly qualifies the definition of "cash price," by the language "unless the context otherwise requires." Wis. Stat. § 218.0101. *See also Reiber v. GMAC, LLC (In re Peaslee)*, 2008 U.S. App. LEXIS 21788 (2d Cir. Oct. 20, 2008) (noting that while both the UCC and Motor Vehicle Retail Installment Sales Act (MVRSA) are relevant to automotive sales, it is not apparent that "price" in the UCC or "expense" in the UCC Comment should be given the same meaning as "cash price" in the MVRSA); *In re Sanders*, 377 B.R. 836, 851 (Bankr. W.D. Tex. 2007) (separating the definitions of price of the vehicle from the amount financed suggests that "price of the collateral" does not include the amount advanced to pay off the negative equity, even thought that amount is allowed to be financed).

Chapter 342 of the Wisconsin Statutes, specifically Wis. Stat. § 342.19, governs the perfection of security interests in motor vehicles in Wisconsin. If any portion of that Chapter defined or referenced "purchase money security interest" in such a way as to include negative equity, the result would obviously be different. The consumer finance laws cited by Honda Finance are not intended to govern the creation or perfection of security interests, but rather to mandate various disclosures and address how finance charges may be computed. Accordingly,

5

this Court concludes that these statutes should not be read together when construing the hanging paragraph.

Having decided that the negative equity is not protected as part of the purchase money security interest, the question becomes whether Honda Finance's entire claim loses its purchase money status. In other words, does the transformation rule apply to destroy the purchase-money status entirely or does the dual status rule allow the security interest to be a purchase money security interest to some extent and a non-purchase money security interest to some extent. The Bankruptcy Court in *In re Brodowski* thoroughly analyzed the issue, and chose the dual status rule. 391 B.R. 393 (Bankr. S.D. Tex. 2008). This Court cannot improve on *Brodowski's* logic, and agrees that this methodology furthers Congressional intent of preventing debtors from purchasing brand new cars and then immediately filing bankruptcy and stripping down the liens. *See also In re Busby*, 2008 Bankr. LEXIS 2520 (Bankr. S.D. Miss. Aug. 28, 2008); *In re Steele*, 2008 Bankr. LEXIS 1851 (Bankr. N.D. Tex. June 12, 2008) (since hanging paragraph was intended to protect against a debtor who purchases a vehicle in contemplation of stripping down the auto financer's claim in Chapter 13, it makes no sense to read the provision so strictly that any mix of non-purchase money debt would taint the whole and cost the lender the protection Congress intended).

To apply the dual status rule to the claim filed in the Chapter 13 case, the *Brodowski* court also provides a logical and simple calculation. The court determined the total amount financed under the original contract and subtracted the amount of the negative equity. The balance constituted the protected purchase money security interest. The percentage of this balance compared to the total amount financed was determined, and that percentage was applied to the creditor's secured claim at the time of the petition. Application of this formula in this case starts with the amount financed of $30,829.72 and the negative equity of $3,378.56. Accordingly, $27,451.16 or 89.0% is the portion attributable to the purchase money security interest. Honda Finance's filed claim is $27,146.42, and 89.0% of that or $24,160.31 is protected by the hanging paragraph. The balance may be treated as a general unsecured claim.

Dated: October 28, 2008

By the Court:

*Susan Kelley*

Susan V. Kelley
U.S. Bankruptcy Judge